1  CHARLES A. BONNER, ESQ. SB# 85413
   CATHERINE LAGARDE, ESQ. SB# 209255
2  PETER F. LACQUES, ESQ. SB# 172970
   LAW OFFICES OF CHARLES A. BONNER
3  180 HARBOR DRIVE, SUITE 227
   SAUSALITO, CA 94965
4  TEL: (415) 331-3070
   FAX: (415) 331-2738
5

6  HOWARD MOORE JR. ESQ. SB# 55228
   FANIA E. DAVIS ESQ. SB# 87268
7  **LAW OFFICES OF MOORE & MOORE**
   445 BELLEVUE AVENUE, SUITE 202
8  OAKLAND, CA 94610
   Telephone: (510) 451-0104
9  Facsimile: (510) 451-5056

10
   ATTORNEYS FOR PLAINTIFFS
11 Chief Prentice Earl Sanders,
   Espanola Sanders, David R. L. Robinson
12 and Ramona L. McCune-Robinson

13                UNITED STATES DISTRICT COURT
14
                 NORTHERN DISTRICT OF CALIFORNIA
15
   CHIEF PRENTICE EARL SANDERS,        CASE No.:   **C 04-3835 CRB**
16 ESPANOLA SANDERS, DAVID R. L.
   ROBINSON and RAMONA L.              **AMENDED**
17 MCCUNE-ROBINSON                     **COMPLAINT FOR DAMAGES**:
                                       Violation of United States Civil Rights
18        Plaintiffs,                  Laws: 42 U.S.C. §§ 1983 AND 1985;
   vs.                                 Malicious Prosecution;
19                                     Abuse of Process;
   CITY AND COUNTY OF SAN              False Arrest;
20 FRANCISCO, BOARD OF                 Defamation,
   SUPERVISORS, TERENCE HALLINAN       Invasion of Privacy;
21 and DOES 1 through 100, inclusive,  Intentional Infliction of Emotional Distress;
                                       Negligent Infliction of Emotional Distress;
22        Defendants,                  California Labor Code §§ 1102 and 1102.5
                                       Loss of Consortium;
23 _____/   Violation of Unruh Act, California Civil
                                       Code §§ 52.1 and 52.3
24                                     Punitive Damages;

25
26                                     **JURY TRIAL DEMANDED**

27      Plaintiffs PRENTICE EARL SANDERS, ESPANOLA SANDERS, DAVID R. L.

28 ROBINSON and RAMONA L. MCCUNE-ROBINSON allege as follows:

**Amended Complaint for Damages**                                      1

## INTRODUCTION

1.    This is a civil action seeking damages against defendants for committing acts, under color of law, which deprived Plaintiffs PRENTICE EARL SANDERS (hereinafter, CHIEF SANDERS), ESPANOLA SANDERS, DAVID R. L. ROBINSON (hereinafter, "DEPUTY CHIEF ROBINSON") and Ramona L. McCune-Robinson of rights secured under the Constitution and laws of the United States; for conspiring for the purpose of impeding and hindering the due course of justice, with intent to deny plaintiffs equal protection of laws; for the intent to suppress the free speech rights of Plaintiffs CHIEF SANDERS and DEPUTY CHIEF ROBINSON; and for refusing or neglecting to prevent such deprivations and denials of Civil Rights of  Plaintiffs CHIEF SANDERS and DEPUTY CHIEF ROBINSON. More specifically, DA HALLINAN and the other defendants improperly instigated a criminal prosecution of CHIEF SANDERS and DEPUTY CHIEF ROBINSON, without probable cause, and in fact knowing that they were innocent of any wrongdoing, motivated by Defendant DISTRICT ATTORNEY TERRENCE HALLINAN's (hereinafter "DA HALLINAN")  political ambitions and in retaliation for Plaintiffs CHIEF SANDERS and DEPUTY CHIEF ROBINSON's  refusal to obstruct justice to serve DA HALLINAN's political needs.

## JURISDICTION

2.    This action is brought pursuant to 42 U.S.C. Sections 1983, 1985 and the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution.  The Court has jurisdiction over this case under 28 U.S.C. §1331 because plaintiffs' claims arise under the federal civil rights statutes of the United States.  Plaintiffs further invoke the pendant jurisdiction of this Court to hear and decide claims arising out of state law because state and federal claims are derived from the common nucleus of operative facts.

3.    To the extent plaintiffs herein are required to comply with any claims statutes, plaintiffs  have complied with all applicable claims statutes.

## PARTIES

4.  Plaintiff CHIEF SANDERS is and was at all times relevant herein a citizen of the United States and resident of San Francisco. At all times herein mentioned CHIEF SANDERS was a duly

1  appointed city official, to wit: The Chief of Police for the City and County of San Francisco, having
2  been officially appointed to that esteemed office by the then Mayor, the Honorable Willie L. Brown,
3  on July 12, 2002. At all relevant times mentioned herein, CHIEF SANDERS was an employee of
4  the City and County of San Francisco.

5      5.  Plaintiff ESPANOLA SANDERS is and was at all times relevant herein a citizen of the
6  United States and resident of California.

7      6.  Plaintiff DEPUTY CHIEF ROBINSON is and was at all times relevant herein a citizen
8  of the United States and resident of California.  At all times herein mentioned DEPUTY CHIEF
9  ROBINSON was a duly appointed city official, to wit:  The Deputy Chief of Police for the City and
10  County of San Francisco, having been officially appointed to that esteemed office on July 24, 2002.
11  At all relevant times mentioned herein, DEPUTY CHIEF ROBINSON was an employee of the City
12  and County of San Francisco.

13      7.  Plaintiff Ramona L. McCune-Robinson is and was at all times relevant herein a citizen
14  of the United States and resident of California.

15      8.  Defendant CITY AND COUNTY OF SAN FRANCISCO is a municipal corporation,
16  organized under the laws of the state of California, doing business in California as a government
17  subdivision under color of State authority and subject to the laws of this State and the United States,
18  and is responsible for the administration of the District Attorney's Office and the employment of the
19  individual defendants in this action.  The City and County has a legal obligation to uphold due
20  process rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution.

21      9.  Defendant BOARD OF SUPERVISORS is organized under the laws of the State of
22  California doing business in California as a government subdivision under color of State authority
23  and subject to the laws of this State and the United States.

24      10.  Defendant DA HALLINAN was at all times relevant herein a duly elected District
25  Attorney for the City and County of San Francisco and directly responsible for the supervision and
26  management of the District Attorney's Office for the City and County of San Francisco.

27      11.  At all times mentioned herein DA HALLINAN was acting under color of State law, to
28  wit: under the colors of the statutes, ordinances, regulations, policies, customs, and usages of the

1   State of California and the CITY AND COUNTY OF SAN FRANCISCO, and was acting within

2   the course and scope of his employment.   Furthermore, DA HALLINAN, as the elected District

3   Attorney, was directly responsible for the supervision and management of the District Attorney's

4   Office for  the City  and County of San Francisco and was the employee, agent, servant, final

5   policymaking authority, final decision-maker, and managing agent, or other representative of the

6   City  and County of San Francisco,  and of the Board of Supervisors for City and County of San

7   Francisco, and in doing the things alleged hereinafter, was acting within the course and scope of his

8   employment, agency, final policymaking  authority, final decision-maker, or other representation,

9   and with the permission and consent of the Board of Supervisors for City and County of San

10   Francisco. DA HALLINAN is sued herein both his individual and official  capacity.

11        12.        Upon information and belief, Defendants CITY AND COUNTY OF SAN

12   FRANCISCO, and the BOARD OF SUPERVISORS, approved and ratified the illegal conduct

13   outlined below of DA HALLINAN.

14                                  **VENUE**

15        13.   This is the proper venue for this action under 28 U.S.C. §1391(b)(1) and (2) in that each

16   of the defendants and plaintiffs herein are residents of the State of California, within the immediate

17   territorial boundaries of this judicial district, and the wrongful conduct alleged herein occurred in

18   this judicial district.

19        14.     Defendants conduct their business and are a government agency operating under color

20   of State authority in this judicial district, and the wrongful conduct alleged herein occurred in this

21   judicial district.

22        15.     Plaintiffs do not presently know the true names and capacities of Defendants DOES

23   1 through 100, inclusive, and therefore sue them by these fictitious names. Plaintiffs are informed

24   and believe, and on that basis, allege, that DOES 1 through 100, and each of them, were responsible

25   in some manner for the injuries and damages alleged herein and claimed in this lawsuit.  Plaintiffs

26   will seek leave to amend this Complaint to add their true names and capacities when they have been

27   ascertained.

28

1

## STATEMENT OF FACTS

2      16.     On or about July12, 2002, CHIEF SANDERS was sworn into office as the Chief of

3  Police for the City and County of San Francisco by then Mayor Willie L. Brown.

4      17.     CHIEF SANDERS has enjoyed a stellar reputation as a police officer, with his public

5  service spanning a period over 39 years, including serving as Senior Homicide Inspector for the City

6  and County of San Francisco. At all relevant times, DA HALLINAN knew of CHIEF SANDERS'

7  impeccable reputation, which is recognized and celebrated internationally as performance in

8  accordance with the highest standards of integrity, morality and professionalism. His 39 year career

9  in law enforcement has been a story of personal heroism, police reform and unimpeachable integrity.

10  He was the first African American to serve as Police Chief and was and is responsible for integrating

11  the SFPD with women and minority police officers. He holds one Masters degree, with substantial

12  course work towards a second Maters degree and a Ph.D. Chief Sanders taught criminal

13  investigations at universities and has broken the "code of silence" by testifying as an expert witness

14  on behalf of victims of police violence and misconduct.

15      18.     On or about July 24, 2002, DEPUTY CHIEF ROBINSON was appointed Deputy

16  Chief of Police for the City and County of San Francisco.

17      19.     DEPUTY CHIEF ROBINSON has enjoyed a stellar reputation as a police officer

18  since 1979, including serving as Commander for the Department of Parking and Traffic and

19  Lieutenant in Charge of Homicide and Narcotics for the City and County of San Francisco. He has

20  received numerous awards for outstanding service and performance, including Mayor's

21  Commendations, Law Management Training Awards, four (4) Medals of Valor and Federal

22  Meritorious Commendations. He is certified as an Expert Witness both in state court and federal

23  court.

24      20.     On or about November 20, 2002, an incident occurred at the intersection of Union

25  and Laguna Streets involving a misdemeanor, mutual combat street fight, involving off-duty San

26  Francisco police officers Alex Fagan, Jr., Matt Tonsing and David Lee, and citizens Jade Santaro

27  and Adam Snyder.

28

1 **Chief Sanders' Investigative Report of INCIDENT**

2     21.  At noon on November 20, 2002, Police Lt. Dutto of General Works assigned Inspectors

3 Venters and Pieralde to conduct a full investigation of the INCIDENT. As soon as it was learned that

4 one of the suspects was the son of Assistant Chief Alex Fagan, Assistant Chief Fagan disqualified

5 himself from any involvement in the case, to wit:  the criminal investigation and any internal affairs

6 investigation.

7     22.  On or about November 22, 2002, and continuing to present, DA HALLINAN, entered

8 into  conspiracies and agreements with others, including employees of the City and County of San

9 Francisco to deprive Plaintiffs CHIEF SANDERS and DEPUTY CHIEF ROBINSON of their

10 Constitutional Rights in violation of 42 United States Code, Section  1983 and 1985, and to falsely

11 accuse them of criminal conduct.

12     23.  On December 2, 2002, DA HALLINAN asked to meet with CHIEF SANDERS. During

13 the brief meeting, DA HALLINAN suggested that CHIEF SANDERS direct the suspect officers to

14 simply admit and plead guilty to misdemeanors for the street fight.  DA HALLINAN emphasized

15 that the officers cases could be disposed of in much the same manner as DA HALLINAN's son's

16 assault case had been handled. CHIEF SANDERS did not know, until DA HALLINAN informed

17 him, that DA HALLINAN's son, Brandon Hallinan, had been arrested and convicted of two assaults.

18 DA HALLINAN told CHIEF SANDERS that his son had received community service for his

19 multiple assault convictions and these suspect officers could expect similar minimum treatment.

20 CHIEF SANDERS did not consider it appropriate to respond to DA HALLINAN's comments on

21 his son's problems or the suspect officers' situation as the SFPD investigative report was due to be

22 presented to him the following day.

23     24.  By December 3, 2002, the assigned inspectors had completed their investigation of the

24 INCIDENT. The case was solved and presented to DA HALLINAN for his decision to prosecute or

25 not to prosecute. The alleged victims of the alleged assaults had given their statements, crime photos,

26 medical records, blood tests and all physical evidence of a street brawl were presented to DA

27 HALLINAN on December 3, 2002. On this date, however, DA HALLINAN returned the file to

28 SFPD requesting further investigation. The primary thrust of the request for more information was

1  to survey Union Street – bartenders, waiters, etc. – to determine if there were any non-participant

2  eyewitnesses to the fight. Further police investigation disclosed two witnesses who observed the

3  crime scene investigation but stated that they did not see how the altercation started.

4      25.   In short, the police investigation had solved a street assault case and provided the

5  District Attorney with all the facts necessary to make a prosecutorial decision on whether and how

6  to proceed.

7      26.   What proved unusual about DA HALLINAN's referral of the investigation back to

8  SFPD, was the commencement of an investigation of the investigators, including the police brass.

9  Without a single morsel of evidence or the slightest probable cause, DA HALLINAN apparently

10 prevailed on Lt. Dutto to interrogate every police officer – no matter their rank or role in the case –

11 about the propriety of the investigation of a simple, alcohol related street brawl. DA HALLINAN

12 has repeatedly and publicly stated that Lt. Dutto was the "lead investigator' and he wanted him to

13 question all the officers involved in the case no matter how tangentially their participation. DA

14 HALLINAN was and is wrong. Lt. Dutto is not and has never been the "lead investigator." As the

15 then head of General Works, he was a middle manager who assigned the case to inspectors Venters

16 and Pieralde hours after the INCIDENT  was reported to the police. Police inspectors, not their

17 managers, conduct investigations.

18     27.   On December 11, 2002, the police department submitted its entire file to DA

19 HALLINAN. The only additional evidence was the arrival of lab results and the statements of two

20 street witnesses who could add nothing regarding the commencement or nature of the Union Street

21 fight. The prosecutorial decision in this matter had rested on DA HALLINAN's lap for more than

22 a month. Instead of exercising his prosecutorial responsibilities, DA HALLINAN launched a

23 "scorched earth" campaign, attacking the integrity of the investigation and the integrity of CHIEF

24 SANDERS and DEPUTY CHIEF ROBINSON and of the San Francisco Police Department.

25 **DA HALLINAN Knowingly Prosecutes the Innocent**

26     28.   On or about February 27, 2003, DA HALLINAN wrongfully convened a Grand Jury,

27 knowing that he lacked any probable cause, let alone sufficient probable cause, of any crime

28 committed by CHIEF SANDERS, DEPUTY CHIEF ROBINSON or by any member of the Chief's

1    command staff.

2        29.   On or about February 27, 2003, DA HALLINAN, maliciously and without probable

3    cause, and without any evidence of wrongdoing or illegal acts whatsoever by CHIEF SANDERS,

4    DEPUTY CHIEF ROBINSON  or by any member of the Chief's command staff  or officers,

5    presented to the Grand Jury for the City and County of San Francisco a case involving a

6    misdemeanor, a mutual combat street fight, *People of the State of California v. Alex Fagan Jr.,*

7    *David Lee and Matthew Tonsing*, (the "INCIDENT") California Superior Court Action Number

8    188728-9. DA HALLINAN falsely urged, incited, and inflamed the Grand Jury, with no evidence,

9    that CHIEF SANDERS, DEPUTY CHIEF ROBINSON  and members of the SFPD's top ranking

10   staff "...obstructed and obstructed and obstructed..." the investigation of the INCIDENT.  Attached

11   hereto as **Exhibit 1** is a true and correct copy of said Grand Jury Indictment.

12       30.   On February 27, 2003, DA  HALLINAN made an admission to the Grand Jury that

13   he had  no evidence of conspiracy by plaintiffs or any of the SFPD leadership.  During this same

14   appearance, in spite of his knowledge and admission that  he had no evidence of a conspiracy, DA

15   HALLINAN maliciously, falsely, and unethically continued to assert to the Grand Jury, like a

16   mantra, accusations of wrong doing and obstruction by plaintiffs, stating words to the effect of

17   **"WE HAVE RUN INTO OBSTRUCTION AFTER OBSTRUCTION"**.   In so doing, DA

18   HALLINAN succeeded  in his efforts to incite, instigate and inflame  the Grand Jury to return a

19   groundless indictment against CHIEF SANDERS and DEPUTY CHIEF ROBINSON and their

20   command staff.

21       31.   On February 27, 2003, also appearing before the Grand Jury, Assistant District

22   Attorney Albert Murray further admitted that DA HALLINAN had no evidence of a conspiracy by

23   plaintiffs or any of the SFPD leadership.  Said admission by Albert Murray was authorized by, and

24   is imputed to DA HALLINAN.

25       32.  DA HALLINAN's wrongful prosecution of the innocent Plaintiffs CHIEF SANDERS

26   and DEPUTY CHIEF ROBINSON, compelled these plaintiffs to be arrested, fingerprinted, subjected

27   to police mug-shots, arraigned and treated like common criminals.  On or about March 3, 2003,

28   CHIEF SANDERS and DEPUTY CHIEF ROBINSON were arraigned.  CHIEF SANDERS suffered

1   a stroke in the courtroom during the wrongful arraignment.

2       33.    On March 11, 2003, DA HALLINAN dismissed the charges against CHIEF

3   SANDERS and Assistant Chief Fagan Sr., stating to the court that after personally reviewing the

4   Grand Jury transcript, he was dismissing the charges "in the interest of justice." DA HALLINAN

5   knew at the time he made the decision to present the case to the Grand Jury, the interest of justice

6   was not being served as there was no evidence proving probable cause of any crime by Plaintiffs

7   CHIEF SANDERS and DEPUTY CHIEF ROBINSON or the SFPD leadership.

8       34.    On April 4, 2003, the San Francisco Superior Court  heard a motion made pursuant

9   to Penal Code §995(B)  to dismiss the Grand Jury's indictments as to the Chief's command staff,

10   including DEPUTY CHIEF ROBINSON, on the grounds that they had  been indicted without

11   reasonable or probable cause.  The court granted the motion as to each of the officers so indicted,

12   including DEPUTY CHIEF ROBINSON, Sgt. Symes, Lt. Cota, Captain Corrales and Commander

13   Suhr.  Attached hereto as **Exhibit 2** is a true and correct copy of the transcript of said hearing.  In

14   so ordering, the court  made the following findings and stated them on the record:

15            a)    That the District Attorney's office, including DA HALLINAN, had told the

16                   Grand Jury on February 27, 2003 that there was not enough evidence to indict

17                   on a conspiracy charge, but that DA HALLINAN presented no other charges

18                   other than conspiracy;

19            b)    That DA HALLINAN and the District Attorney's Office failed to abide by

20                   the ethics code for prosecuting attorneys by failing to dismiss the criminal

21                   case when they themselves admitted there was no evidence to support the

22                   charges;

23            c)    Because DA HALLINAN and the District Attorney's Office failed to dismiss

24                   the criminal prosecutions pursuant to their ethical obligations to do so, the

25                   court dismissed the criminal charges against DEPUTY CHIEF ROBINSON,

26                   Sgt. Symes, Lt. Cota, Captain Corrales and Commander Suhr.

27       35.    Subsequently, CHIEF SANDERS made a motion for a finding of factual innocence

28   pursuant to California Penal Code §851.8, which was granted.  Attached hereto as **Exhibit 3** is a

1 | true and correct copy of said Order of Factual Innocence, dated August 20, 2003.

2 |      36.    For purposes of obtaining a finding of factual innocence pursuant to Penal Code §
3 | 851.8(b) factual innocence is based upon a finding "that facts exists which would lead no person
4 | of ordinary care and prudence to believe or conscientiously entertain any honest and strong suspicion
5 | that the person arrested is guilty of the crimes charged." *People v. Chagoyan* (2003) 107
6 | Cal.App.4th 810, at 816. The record must exonerate, and not merely raise a substantial question as
7 | to guilt. *People v. Adair* (2003) 29 Cal.4th 895, 909. DA HALLINAN's admission that the Chief
8 | was factually innocent is compelling evidence that DA HALLINAN has engaged in a malicious
9 | prosecution of an innocent man, destroying his stellar reputation and legally causing the damages
10 | sought in this claim. DA HALLINAN engaged in many acts, which are slanderous and caused great
11 | damage to the plaintiffs herein.

12 |      37.    During the course of DA HALLINAN's investigation of the INCIDENT and his
13 | failed attempt to indict CHIEF SANDERS, DEPUTY CHIEF ROBINSON and the Chief command
14 | staff, he made numerous willfully false and unprivileged statements and allegations concerning the
15 | plaintiffs herein and their investigation of the underlying incident of November 20, 2002. The
16 | following false statements said by DA HALLINAN were intended to imply, and did imply that
17 | Plaintiffs CHIEF SANDERS and DEPUTY CHIEF ROBINSON and SFPD leadership committed
18 | numerous intentional lapses in their investigation of the INCIDENT in an effort to cover-up
19 | wrongdoing by themselves and other SFPD officers:

20 |      a.    DA HALLINAN stated repeatedly, both in the criminal prosecution and in
21 | statements to the media, that there was "No Cold Show" of suspects involved in the
22 | INCIDENT, and that such failure to make a "Cold Show" was evidence of an attempted
23 | coverup by Plaintiffs CHIEF SANDERS and DEPUTY CHIEF ROBINSON herein and other
24 | SFPD leadership. This representation was false.

25 |      b.   DA HALLINAN stated repeatedly, both in the criminal prosecution and in
26 | statements to the media, that the investigating officers "Did not collect clothes of assailants." DA
27 | HALLINAN charged that the suspects' clothes and shoes should have been seized for blood
28 | evidence. In fact, on November 25, 2002, the suspects turned over their clothes to the investigators

1  and police impounded their pick-up truck identified by the alleged victims, all of which is part the

2  investigative report presented to DA HALLINAN on December 11, 2002.

3          c.      DA HALLINAN stated repeatedly, both in the criminal prosecution and in

4  statements to the media, that the investigating officers "Should have performed a DUI [sobriety]

5  test" of the suspects in the incident, when in fact, a sobriety test would not have proven nor

6  disproved whether an assault had occurred during the INCIDENT.   Additionally, none of the

7  participants in the INCIDENT were suspected of driving while under the influence.   Furthermore,

8  as the investigative report by SFPD (which was provided to DA HALLINAN) indicates, the suspects

9  invoked their Miranda rights. Most importantly, MCD, Internal Affairs Investigation, required a

10 urine test of each of the officers. Such a test would also show drugs in the system. Internal affairs

11 evidence – acquired from police under compulsion – may not be used by the District Attorney which

12 the Chief pointed out to him. HALLINAN knew that the lack of a sobriety test at the scene of any

13 of the five parties to the fight did not prove a "cover-up" by the Chief, yet persisted in publishing

14 and charging accusations that such a failure to take a sobriety test was evidence of a coverup by

15 Plaintiffs and SFPD leadership.

16          d.      In an interview on (Channel 2) KTVU television, DA HALLINAN stated that

17 the police investigation of the INCIDENT had "Watergate aspects," including "The reassignment

18 taking him [ Lt. Joe Dutto] off the case at a critical point." DA HALLINAN also falsely stated

19 normal procedures were not followed in this investigation, that "nothing was done in a normal

20 fashion." He also falsely stated that an arrest should have been made. DA HALLINAN also falsely

21 stated that investigators in the case had been stalled in their efforts to investigate. DA HALLINAN

22 falsely stated, "There is a division within the department between the working cops, who want the

23 real facts, and the brass, who are making it real difficult for those officers to do their job."  With

24 respect to the reassignment of Lt. Dutto, DA HALLINAN knowingly falsely claimed that "well, it

25 has almost Watergate aspects to it (the reassignment)–taking him off the case at a critical point. He

26 was doing a real good job. He wanted to get the facts of what happened."

27      38.      DA HALLINAN's false statement that Plaintiffs CHIEF SANDERS and DEPUTY

28 CHIEF ROBINSON and CHIEF SANDERS' command staff engaged in "a cover-up",   with

"Watergate aspects" is slander and Defamation Per Se. DA HALLINAN's own admission, plus the imputed admission by his senior Deputy Assistant District Attorney, Albert Murray, coupled with the judge's Order after extensive examination of the record confirmed in fact there was no cover-up or conspiracy to cover-up or obstruct justice.   DA HALLINAN made such statements with knowledge of their falsity and reckless disregard of the truth, and the rights and safety of each of the plaintiffs herein.

39.      With respect to the reassignment of Lt. Dutto, DA HALLINAN knowingly falsely claimed on public television that "well, it has almost Watergate aspects to it (the reassignment)–taking him off the case at a critical point. He was doing a real good job. He wanted to get the facts of what happened." DA HALLINAN defamed CHIEF SANDERS and DEPUTY CHIEF ROBINSON with his inflammatory reference to then President Nixon's removal of Special Prosecutor, Archibald Cox, who was in the process of presenting evidence of President Nixon's "cover-up" of the Watergate burglary. DA HALLINAN knew that neither CHIEF SANDERS, nor any member of his staff had engaged in a "cover-up" of the investigation of the INCIDENT, a simple street fight about left-over food. Further, DA HALLINAN knew, or should have known, that Lt. Dutto, in addition to a list of approximately 17 other officers, had been scheduled to be transferred and resigned months before the INCIDENT.

40.      DA HALLINAN knew, or should have known, Dutto's role on this investigation team. DA HALLINAN knew that Dutto assigned the original inspectors on November 20, 2002 and he was charged with managing SFPD's General Works Division of Investigation, not personally investigating this or any other case. Furthermore, DA HALLINAN knew, or should have known, why Dutto was transferred, which was due to a complete restructuring of the Bureau of Inspectors as a result of retirements and promotions, with considerations to the available skills, talent and management abilities available to the command staff. Lt. Dutto, along with more than a dozen officers, was transferred for these reasons. Again, DA HALLINAN knew, or should have known, this transfer had been planned and scheduled to take place when it did way in advance of the INCIDENT.

41.      DA HALLINAN presented false claims to the Grand Jury that the Chief and his

1  administration "...obstructed, obstructed, obstructed..." the investigation of the November 20, 2002
2  INCIDENT.

3      42.     DA HALLINAN also willfully and falsely told the grand jury that "the victims
4  demanded, asked if they could get a cold show, that is if they could identify who had done what to
5  them. That was refused both at the scene and later at the police station."

6      43.     The true fact is that there was a "cold show". That is, there was an *on the scene*
7  *identification of the alleged assailants* and there was an admission by the alleged assailants that they
8  were the parties involved in the fight. At the time he made these false allegations and accusations,
9  DA HALLINAN knew these allegations and accusations to be false.

10  **DA HALLINAN Twice Solicited Chief Sanders to Obstruct Justice.**

11     44.     On December 2, 2002, DA HALLINAN asked to meet with CHIEF SANDERS in
12  the Chief's office. During their brief meeting, DA HALLINAN suggested that the suspect officers
13  simply admit to a street fight and that it could be disposed of in much the same manner as his son's
14  assault case had been handled. CHIEF SANDERS did not know, until DA HALLINAN informed
15  him, that DA HALLINAN's son had been arrested and convicted of two assaults. DA HALLINAN
16  told CHIEF SANDERS that his son, Brendan HALLINAN, had received community service for his
17  assault convictions and the suspect officers could expect similar treatment if they would simply
18  admit to assaulting the other parties in the INCIDENT.   CHIEF SANDERS did not consider it
19  appropriate to respond to DA HALLINAN's comments on his son's problems or the suspect officers'
20  situation as the SFPD investigative report was due to be presented to the DA the following day,
21  December 3, 2002.

22     45.     On January 13, 2003, District Attorney HALLINAN requested that CHIEF
23  SANDERS meet with him away from the Hall of Justice. The Chief and DA met at 8:00 a.m. at the
24  Cathedral Hill Coffee Shop on Van Ness Avenue in San Francisco. DA HALLINAN told the Chief
25  he wanted the case settled. Since the case had been submitted to DA HALLINAN a month earlier
26  the Chief expressed surprise: "I thought the case was settled in that all the evidence has been
27  collected as to who was involved and the allegations of what happened." DA HALLINAN repeated
28  his campaign rhetoric about cold show, clothes seizures and inability to interrogate the investigators.

Amended Complaint for Damages                                                                    13

1  Then District Attorney HALLINAN revealed the true purpose for the meeting. He said, "**You know**
2  **we can still clear this up by having them [the off-duty police officers involved in the**
3  **INCIDENT ]just tell what happened, plead to a misdemeanor and I'll give them a slap on the**
4  **wrist. Just like my son's case."**  The Chief was shocked by DA HALLINAN'S repeated overt
5  solicitations to interfere with the legal rights of the parties to the fight.

6       46.     CHIEF SANDERS examined police and court records relative to Brendan
7  HALLINAN's criminal charges. They revealed that Brendan HALLINAN had been arrested for
8  savagely assaulting two men, (good Samaritans attempting to help the excessively intoxicated young
9  HALLINAN) on Haight Street in the early morning hours of September 13, 2001. Ten days later,
10  his father, DA HALLINAN, dismissed the charges. In June the following year, young HALLINAN
11  surrendered on a battery warrant issued by the Attorney General. According to court records,
12  Brendan HALLINAN's alcohol-related street assault was pending on November 20, 2002. Records
13  revealed that Brendan's negotiated disposition coincided with his father's proposal to the Chief that
14  he urge Assistant Chief Fagan's son to accept a similar disposition. Because of these blatantly
15  improper, illegal and unethical solicitations, the Chief refused any further meetings with District
16  Attorney HALLINAN.

17       47.     Following the January 13, 2003 meeting with DA HALLINAN, CHIEF SANDERS
18  informed Mayor Brown and Gregg Lowder, Executive Director of the Mayor's Council on Criminal
19  Justice, of District Attorney HALLINAN's unethical proposals and solicitations.

20       48.     Following, and in retaliation for, CHIEF SANDERS' refusal to corrupt the criminal
21  justice system as DA HALLINAN had proposed, and in retaliation for CHIEF SANDERS reporting
22  DA HALLINAN's unethical proposals to Mayor Brown and Gregg Lowder, DA HALLINAN
23  orchestrated a massive media campaign defaming the integrity of the SFPD top leadership, including
24  CHIEF SANDERS and DEPUTY CHIEF ROBINSON. DA HALLINAN intensified his personal
25  investigation of the investigators, completely taking over the police investigation and directed his
26  media campaign entirely at the Chief, the department and its command staff, including DEPUTY
27  CHIEF ROBINSON.   He refused to make a charging decision on the three off-duty officers and
28  instead sought to implicate officers, ranking members and command staff in a phony cover-up.

1       49.     During the meeting between DA HALLINAN and CHIEF SANDERS on January 13,

2   2003, at the Cathedral Hill Hotel Coffee Shop, The Chief asked DA HALLINAN why he had not

3   made a decision to prosecute. The Chief questioned him about the investigation and asked what, if

4   anything, was missing from this alleged assault investigation. DA HALLINAN could not indicate

5   any flaws in the investigation from a prosecutor's point of view. The Chief then said: "Terence, we

6   have all these allegations in the press about the investigation. If you think or feel there is any merit

7   to these speculations, have your people do the investigation. I've worked with DA's investigators

8   on police shootings and they're very competent." District Attorney HALLINAN replied: "My

9   investigators are too busy. They're doing grant work."

10   **DA HALLINAN'S Conduct was Unethical in Violation of the Bar Rules**

11       50.     California State Bar Rules of Professional Conduct provide, in relevant part:

12   Rule 5-110. Performing the Duty of Member in Government Service.

> **A member in government service shall not institute or cause to be instituted criminal charges when the member knows or should know that the charges are not supported by probable cause. If, after the institution of criminal charges, the member in government service having responsibility for prosecuting the charges becomes aware that those charges are not supported by probable cause, the member shall promptly so advise the court in which the criminal matter is pending.**

17       51.     DA HALLINAN willfully indicted, jailed, booked, arraigned and prosecuted CHIEF

18   SANDERS and DEPUTY CHIEF ROBINSON, fully knowing that they were innocent. In doing so,

19   DA HALLINAN breached a duty of ethics as a District Attorney to refrain from presenting a case

20   to a Grand Jury for indictment without evidence of probable cause; and for thereafter prosecuting

21   two innocent men without evidence of probable cause or guilt. In this regard, the California

22   Supreme Court has affirmed the prosecutor's legal obligation as reflected in the California Rules of

23   Professional Conduct, Rule 5-110:

> "When the district attorney chooses to proceed by indictment rather than by information, the indictment itself must be "draw[n]' by the district attorney. (Gov. Code, § 26502.) However, a prosecutor who draws an indictment acts as more than a mere scribe. The prosecutor alleges the facts contained in the indictment and is bound by rule 5-110 of the California Rules of Professional Conduct, which prohibits prosecutors from "institut[ing] or caus[ing] to be instituted criminal charges when the member knows or should know that the charges are not supported by probable cause.' The public prosecutor is also specifically charged "within his or her discretion' to "initiate and conduct . . . all prosecutions.' (Gov. Code, § 26500.) Therefore, while the indictment may contain the allegations of the grand jury, it also contains the

1

2

3

allegations of the prosecutor, who drafts the indictment and who is bound to exercise discretion to initiate the prosecution only upon such charges that the prosecutor knows are supported by probable cause."
*Guillory v. Superior Court of Contra Costa County* (2003) 31 Cal.4th 168 at 174

4   52.   DA HALLINAN knew at all times there was no probable cause to present facts to

5   the Grand Jury regarding CHIEF SANDERS, DEPUTY CHIEF ROBINSON and the SFPD

6   command staff as having committed any crimes whatsoever.   When DA HALLINAN told his

7   senior deputies of his Grand Jury plan they objected.   On information and belief, First Chief

8   Assistant District Attorney Paul Cummins told DA HALLINAN that it was illegal and unethical

9   to use the Grand Jury in the fashion he proposed, emphasizing the admitted lack of evidence to prove

10  a conspiracy by the Chief or any member of his top brass.

11   53.   Specifically, First Chief Assistant District Attorney Paul Cummings, met with DA

12  HALLINAN in Cummings office, in efforts to dissuade DA HALLINAN in his zeal to prosecute

13  CHIEF SANDERS and his command staff. In this regard, First Chief Assistant Cummings walked

14  over to his bookshelf, pulled down two books regarding Prosecutors Ethics: 1. The Uniform Crime

15  Charging Standards, published by the California District Attorney Association; and 2.   The

16  California Rules of Professional Responsibility.

17   54.   In the first publication, First Chief Assistant Cummings opened the Uniform Crime

18  Charging Standards, pointed with his finger to the "Evidentiary Sufficiency" highlighted section on

19  page 13, and emphasized to DA HALLINAN that by his own admissions, and by the lack of

20  evidence that CHIEF SANDERS, or any of the command staff, had committed a crime, that he

21  should not go forward with his intended prosecution. First Chief Assistant Cummings made it clear

22  to DA HALLINAN that he was violating the prosecutor's "basic criteria for charging" set forth in

23  the Uniform Crime Charging Standards.

24   55.   First Chief Assistant Cummings then pulled down the California Rules of

25  Professional Responsibility and physically showed DA HALLINAN Rule 5-110, prohibiting

26  government agents from prosecuting innocent people without probable cause.

27   56.   Like a piece of lint on his pinstriped suit, DA HALLINAN brushed off his First Chief

28  Assistant's admonition, replying: "but I'm a politician", and affirmed he was going to present the

**Amended Complaint for Damages**                                                                                    16

1   case to the Grand Jury. After the Grand Jury Indictment had been dismissed by the Superior Court,

2   which held that DA HALLINAN had been unethical, DA HALLINAN retaliated and demoted

3   First Chief Assistant Paul Cummings for his honest expression of prosecutorial ethics.

4         57.     Therefore, City and County of San Francisco and Ex District Attorney DA

5   HALLINAN, are liable to CHIEF SANDERS, DEPUTY CHIEF ROBINSON, RAMONA L.

6   McCUNE- ROBINSON and ESPANOLA SANDERS for DA HALLINAN's conduct committed

7   during the course and scope of his duties as a District Attorney for the City and County of San

8   Francisco since DA HALLINAN "(1) had final policy making authority concerning the action

9   alleged to have caused the particular constitutional or statutory violation at issue and (2) was the

10   policymaker for the [City and County of San Francisco] for the purposes of the particular act."

11   *Weiner v. San Deigo County* 210 F.3d 1025, 1028 (9th Cir. 2000) (citing *McMillian v. Monroe*

12   *County*, 520 U.S. 781, 785 (1997)).

13         58.     DA HALLINAN cannot escape liability by hiding under the rock of immunity as the

14   law is clear: "Qualified immunity 'shield[s] [government agents] from liability for civil damages

15   insofar as their conduct does not violate clearly established statutory or constitutional rights of which

16   a reasonable person would have known" *Behrens v. Pelletier*, 516 U.S. 299, 305 (1996); *Harlow v.*

17   *Fitzgerald*, 457 U.S. 800 (1992). The analysis of the issue of qualified immunity follows a two part

18   test: "1) we ask whether the law governing the official's conduct clearly established;2) if so, we ask

19   whether, under that law, a reasonable officer could have believed the conduct was lawful". *Robinson*

20   *v. Solono County*, 218 F. 3d 1030, 1034 (9th Cir. 2000). A Reasonable Prosecutor, like First Chief

21   Assistant Deputy Prosecutor Paul Cummings would know, and did know, that to prosecute CHIEF

22   SANDERS and DEPUTY CHIEF ROBINSON without evidence of probable cause would violate

23   Rule 5-110 and the United States Constitution. DA HALLINAN also knew this simple, clearly

24   established Rule. Moreover, absolute immunity is not available to DA HALLINAN during his

25   investigative phase of prosecution. (*Buckley v. Fitzsimmons*, 509 U.S. 259 (1993) Hence, DA

26   HALLINAN is stripped of any protective covering of immunity.

27         59.     DA HALLINAN's actionable conduct includes, but is not limited to, indicting

28   CHIEF SANDERS and DEPUTY CHIEF ROBINSON with knowledge that there was no evidence

of conspiracy by CHIEF SANDERS, DEPUTY CHIEF ROBINSON, or any member of the brass; indicting CHIEF SANDERS and DEPUTY CHIEF ROBINSON, with knowledge of the state bar ethical rules prohibiting prosecution of an innocent person; knowledge that the police investigation had been completed with exceptional thoroughness for a street fight because police officers were involved, and that he had received a 481 page, San Francisco-phonebook-size, detailed investigation report of the fight, and making false, unprivileged allegations in the news media that Plaintiffs CHIEF SANDERS and DEPUTY CHIEF ROBINSON were involved in a cover-up.

### FIRST CAUSE OF ACTION
#### (False Arrest)
### CHIEF SANDERS and DEPUTY CHIEF ROBINSON Against All Defendants

60.     Paragraphs 1 through 59 are incorporated herein by reference.

61.     Despite the fact that plaintiffs had committed no crime nor broken any law, Defendant DA HALLINAN intentionally, and without probable cause, arrested and/or caused to be arrested and/or directed to be arrested, CHIEF SANDERS and DEPUTY CHIEF ROBINSON. Defendant DA HALLINAN presented false information to, and withheld exculpatory information and evidence from, the Grand Jury which indicted plaintiffs.[1]

62.     Said arrests were in violation of each plaintiffs' right to be free on an unreasonable search and seizure under the Fourth Amendment to the Constitution of the United States.

63.     Said conduct violated the First, Fourth, Fifth and Fourteenth Amendment rights of CHIEF SANDERS and DEPUTY CHIEF ROBINSON.

64.     Said conduct was the legal and proximate cause of damages to plaintiffs as alleged herein below under "DAMAGES." DA HALLINAN's conduct was willful, wanton, malicious, fraudulent and in conscious disregard for the rights of plaintiffs.

**WHEREFORE**, Plaintiffs request relief as hereinafter provided.

### SECOND CAUSE OF ACTION
#### (Defamation - Slander and Libel)
### CHIEF SANDERS and DEPUTY CHIEF ROBINSON Against All Defendants

65.     Paragraphs 1 through 64 are incorporated herein by reference.

---

[1]  See CACI # 1406, citing Ting v. U.S. (9th Cir. 1991) 927 F.2d 1504, 1514.

1      66 .   DA HALLINAN made numerous, unprivileged,  knowingly false statements, and

2 statements in the media regarding CHIEF SANDERS, DEPUTY CHIEF ROBINSON the SFPD

3 leadership, and their investigation of the INCIDENT,  which HALLINAN knew were untrue and/or

4 for which he had no reasonable belief to be true, and which were expressly regarding plaintiffs, or

5 were understood by the media and general public to pertain to plaintiffs.

6      67.   Said false statements, described herein above and below, including the following, were

7 intended to imply, and did imply that Plaintiffs and SFPD leadership committed numerous

8 intentional lapses in their investigation of the INCIDENT in an effort to cover-up wrongdoing by

9 themselves and other SFPD officers:

10          a.    That the investigation of the INCIDENT was "unusual and failed to follow

11              normal procedures;"

12          b.    That the SFPD "Did not collect clothes of assailants," as part of their

13              investigation of the INCIDENT;

14          c.    That the SFPD "Should have performed a DUI  test" as part of their

15              investigation of the INCIDENT;

16          d.    That nothing about the investigation was done in a normal fashion;

17          e.    That SFPD should have collected other evidence;

18          f.    That there was "No Cold Show" of suspects involved in the INCIDENT, and

19              DA HALLINAN further stated and implied that such failure to make a "cold

20              show" was proof of a cover-up by SFPD leadership;

21          g.    That these supposed failures and shortcomings of the SFPD's investigation

22              of the incident was evidence of an attempted coverup by plaintiffs herein and

23              other SFPD leadership;

24          h.    DA HALLINAN also stated: "...There is a division within the department

25              between the working cops, who want the real facts, and the brass, who are

26              making it real difficult for those officers to do their job."  Said comment

27              specifically disparaged the SFPD leadership (referred to as "the brass"),

28              including CHIEF SANDERS and DEPUTY CHIEF ROBINSON;

1          i.      DA HALLINAN also stated: The police investigation had "Watergate

2                  aspects", including the transfer of Lt. Dutto.

3      68.     Furthermore, in an interview on (Channel 2) KTVU television,  DA HALLINAN

4 stated that the police investigation of the INCIDENT had "Watergate aspects," including   "The

5 reassignment taking him  [ Lt. Joe Dutto] off the case at a critical point."

6      69.     DA HALLINAN's false statements that the Chief and his command staff engaged

7 in a "cover up," with "Watergate aspects" is slander and Defamation Per Se of CHIEF SANDERS

8 and DEPUTY CHIEF ROBINSON. DA HALLINAN's own admission, plus the imputed admission

9 by his senior Deputy Assistant District Attorney Albert Murray, coupled with the Judge's Order after

10 extensive examination of the record confirmed in fact there was no cover-up or conspiracy to cover-

11 up or obstruct justice.

12      70.     DA HALLINAN presented false claims to the Grand Jury that the Chief and his

13 administration "...obstructed, obstructed, obstructed..." the investigation of the November 20, 2002

14 INCIDENT.

15      71.     DA HALLINAN made such statements with knowledge of their falsity and with

16 reckless disregard of the truth, and for the rights and safety of CHIEF SANDERS and DEPUTY

17 CHIEF ROBINSON and with the intent to cause harm to plaintiffs; said false statements injured

18 plaintiffs in their occupation, reputation, and exposed them to hatred contempt, ridicule and shame,

19 and had the effect of discouraging others from associating with or dealing with plaintiffs.

20      72.     Said conduct was the legal and proximate cause of damages to plaintiffs as alleged

21 herein below under "DAMAGES." DA HALLINAN's conduct was willful, wanton, malicious,

22 fraudulent and in conscious disregard for the rights of plaintiffs.

23      **WHEREFORE**, Plaintiffs request relief as hereinafter provided.

24 

**THIRD CAUSE OF ACTION**
**(Invasion of Privacy - False Light)**

25 **CHIEF SANDERS and DEPUTY CHIEF ROBINSON Against All Defendants**

26      73.     Paragraphs 1 through 72 are incorporated herein by reference.

27      74.     The untrue statements by DA HALLINAN set forth above depicted plaintiffs in a

28 false light. The false light  in which CHIEF SANDERS and DEPUTY CHIEF ROBINSON were

1   placed would be highly offensive to a reasonable person.

2       75.     DA HALLINAN had knowledge of or acted in reckless disregard as to the falsity of

3   the publicized matter and the false light in which CHIEF SANDERS and DEPUTY CHIEF

4   ROBINSON would be placed.

5       76.     Said conduct was the legal and proximate cause of damages to plaintiffs as alleged

6   herein below under "DAMAGES."  DA HALLINAN's conduct was willful, wanton, malicious,

7   fraudulent and in conscious disregard for the rights of plaintiffs.

8       **WHEREFORE,** Plaintiffs request relief as hereinafter provided.

9                           **FOURTH CAUSE OF ACTION**
                    **(Intentional Infliction of Emotional Distress)**
10      **CHIEF SANDERS and DEPUTY CHIEF ROBINSON Against All Defendants**

11      77.     Paragraphs 1 through 76 are incorporated herein by reference.

12      78.     That defendant's acts were outrageous.

13      79.     That by reason of the defendant's acts, plaintiffs were caused to suffer extreme mental

14  distress, humiliation, embarrassment, extreme shock and nervousness.

15      80.     Said conduct was the legal and proximate cause of damages to plaintiffs as alleged

16  herein below under "DAMAGES."  DA HALLINAN's conduct was willful, wanton, malicious,

17  fraudulent and in conscious disregard for the rights of plaintiffs.

18      **WHEREFORE,** Plaintiffs request relief as hereinafter provided.

19                          **FIFTH CAUSE OF ACTION**
                    **(Negligent Infliction of Emotional Distress)**
20      **CHIEF SANDERS and DEPUTY CHIEF ROBINSON Against All Defendants**

21      81.     Paragraphs 1 through 80 are incorporated herein by reference.

22      82.     The conduct of defendants, and each of them, as set forth herein was negligent, in that

23  said conduct failed to exercise reasonable care to avoid harming the plaintiffs.  That by reason of the

24  defendants' negligence, plaintiffs were caused to suffer extreme mental distress, humiliation,

25  embarrassment, extreme shock and nervousness.

26      83.     Said conduct was the legal and proximate cause of damages to plaintiffs as alleged

27  herein below under "DAMAGES."

28      **WHEREFORE,** Plaintiffs request relief as hereinafter provided.

Amended Complaint for Damages                                          21

1

## SIXTH CAUSE OF ACTION
### (Abuse of Process)
2    **CHIEF SANDERS and DEPUTY CHIEF ROBINSON Against All Defendants**

3        84.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1

4    through 83 herein above as though set forth more fully herein.

5        85.    DA HALLINAN intentionally, willfully and maliciously indicted, jailed, booked,

6    arraigned and prosecuted two innocent men, CHIEF SANDERS and DEPUTY CHIEF ROBINSON,

7    in order to defame the integrity of CHIEF SANDERS, DEPUTY CHIEF ROBINSON and the San

8    Francisco Police Department, all without probable cause, and with no reasonable belief in any

9    probable cause; nor would any reasonable attorney have believed there was probable cause to initiate

10   any proceedings. Furthermore, DA HALLINAN did so also as part of a desperate political ploy to

11   create a dramatic issue for his failed re-election campaign, in that he had hoped that by bringing

12   down the SFPD leadership, he would appear to be crusading against supposed corruption.

13       86.    Said conduct was the legal and proximate cause of damages to plaintiffs as alleged

14   herein below under "DAMAGES." DA HALLINAN's conduct was willful, wanton, malicious,

15   fraudulent and in conscious disregard for the rights of plaintiffs.

16       **WHEREFORE,** Plaintiffs request relief as hereinafter provided.

17

## SEVENTH CAUSE OF ACTION
### (Malicious Prosecution)
18   **CHIEF SANDERS and DEPUTY CHIEF ROBINSON Against All Defendants**

19       87.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1

20   through 86 herein above as though set forth more fully herein.

21       88.    DA HALLINAN intentionally, willfully and maliciously indicted, jailed, booked,

22   arraigned and prosecuted two innocent men, CHIEF SANDERS and DEPUTY CHIEF ROBINSON,

23   in order to defame the integrity of CHIEF SANDERS, DEPUTY CHIEF ROBINSON and the San

24   Francisco Police Department, all without probable cause, and without any reasonable belief in any

25   probable cause. Furthermore, DA HALLINAN did so also as part of a desperate political ploy to

26   create a dramatic issue for his failed re-election campaign, in that he hoped that by bringing down

27   the SFPD leadership, he would appear to be crusading against supposed corruption.

28       89.    Said prosecutions ended with a favorable termination for both CHIEF SANDERS and

1  DEPUTY CHIEF ROBINSON, as each had their cases dismissed, and each received findings of

2  factual innocence pursuant to California Penal Code §851.8, by the judge presiding over their

3  respective cases.

4      90.  Said conduct was the legal and proximate cause of damages to plaintiffs as alleged

5  herein below under "DAMAGES."  DA HALLINAN's conduct was willful, wanton, malicious,

6  fraudulent and in conscious disregard for the rights of plaintiffs.

7      **WHEREFORE,** Plaintiffs request relief as hereinafter provided.

8

9

**EIGHTH CAUSE OF ACTION**
**(Violation of United States Civil Rights Laws)**
**(42 U.S.C. Section 1983)**

10    **CHIEF SANDERS and DEPUTY CHIEF ROBINSON Against All Defendants**

11      91.  Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1

12  through 90  herein above as though set forth more fully herein.

13      92.  Defendants are persons who, under color of law and in the scope of their employment

14  have subjected plaintiffs to the deprivation of their civil rights as guaranteed by the First, Fourth,

15  Fifth and Fourteenth Amendments of the United States Constitution.  Said rights include plaintiffs'

16  right to free speech, freedom from arrest without probable cause, and substantive and procedural due

17  process guaranteed by the First, Fourth, Fifth and Fourteenth Amendments.

18      93.  At all times herein mentioned, DA HALLINAN acted or purported to act within the

19  course and scope of his employment and under color of law.  Furthermore, DA HALLINAN, as the

20  elected District Attorney, was directly responsible for the supervision and management of the

21  District Attorney's Office for  the City  and County of San Francisco and was the employee, agent,

22  servant, final policymaking authority,  final decision-maker, and managing agent, or other

23  representative of the CITY  AND COUNTY OF SAN FRANCISCO,  and of the BOARD OF

24  SUPERVISORS for CITY AND COUNTY OF SAN FRANCISCO, and in doing the things alleged

25  hereinafter, was acting within the course and scope of his employment, agency, final policymaking

26  authority,  final decision-maker, or other representation, and with the permission and consent of the

27  BOARD OF SUPERVISORS for CITY AND COUNTY OF SAN FRANCISCO.  In addition, upon

28  information and belief, defendants CITY AND COUNTY OF SAN FRANCISCO, and the BOARD

Amended Complaint for Damages                                                        23

1  OF SUPERVISORS, approved and ratified the conduct of DA HALLINAN.

2      94.    DA HALLINAN wrongfully convened a Grand Jury to indict CHIEF SANDERS and

3  DEPUTY CHIEF ROBINSON, knowing that he did not have one scintilla of evidence of probable

4  cause of any crime committed by CHIEF SANDERS, DEPUTY CHIEF ROBINSON or by any

5  member of the Chief's command staff. On February 27, 2003, DA HALLINAN made an admission

6  to the Grand Jury that he had no evidence of conspiracy.

7      95.    In spite of his knowledge and admission that he had no evidence of a conspiracy, DA

8  HALLINAN maliciously, falsely, and unethically continued his mantra, **"WE HAVE RUN INTO**

9  **OBSTRUCTION AFTER OBSTRUCTION,"** in his successful efforts to incite, instigate and

10 inflame the Grand Jury to return a groundless indictment against CHIEF SANDERS, DEPUTY

11 CHIEF ROBINSON and SFPD command staff.

12     96.    Furthermore, DA HALLINAN wrongfully instituted the Grand Jury proceedings and

13 investigation against the plaintiffs herein, and made his false and unprivileged statements to the

14 media in retaliation for CHIEF SANDERS exercising his First Amendment Rights by objecting to,

15 and criticizing DA HALLINAN's improper proposal that CHIEF SANDERS interfere with the

16 ongoing police investigation and prevail upon some of the officers to plea to misdemeanors, in

17 exchange for those officers to receive "a slap on the wrist." Said objections and criticisms by CHIEF

18 SANDERS were remarks of public concern, made in direct connection with his public employment

19 and were Constitutionally protected.

20     97.    DA HALLINAN, by instituting the wrongful grand jury proceedings without probable

21 cause and by his other wrongful conduct alleged herein, caused CHIEF SANDERS and DEPUTY

22 CHIEF ROBINSON to be suspended from their public service as leaders of the SFPD while the

23 criminal charges were pending, and thus wrongfully deprived them of their public employment.

24     98.    Said conduct was the legal and proximate cause of damages to plaintiffs as alleged

25 herein below under "DAMAGES." DA HALLINAN's conduct was willful, wanton, malicious,

26 fraudulent and in conscious disregard for the rights of plaintiffs.

27     **WHEREFORE,** Plaintiffs request relief as hereinafter provided.

28

1

2

**NINTH CAUSE OF ACTON**
**(Violation of United States Civil Rights Laws)**
**(42 U.S.C. Section 1985)**
**CHIEF SANDERS and DEPUTY CHIEF ROBINSON Against All Defendants**

3

4

99.     Paragraphs 1 through 98 are incorporated herein by reference.

5

100.    Defendants and each of them have entered into conspiracies with each other, at one

6

time or another, to deprive one or more of plaintiffs, either directly or indirectly, of his or her

7

privileges and immunities under the laws, specifically plaintiffs' civil rights guaranteed by the First,

8

Fourth, Fifth and Fourteenth Amendments of the United States Constitution.

9

101.    Plaintiffs have been injured by being deprived of their rights and privileges as

citizens of the United States, and have been damaged as a result thereof.

10

102.    Said conduct was the legal and proximate cause of damages to plaintiffs as alleged

11

herein below under "DAMAGES."

12

**WHEREFORE**, Plaintiffs request relief as hereinafter provided.

13

14

**TENTH CAUSE OF ACTION**
**(Violations of the Unruh Civil Rights Act)**
**(Section 52.1 and 52.3)**
**CHIEF SANDERS and DEPUTY CHIEF ROBINSON Against All Defendants**

15

16

103.    Paragraphs 1 through 102 are incorporated herein by reference.

17

104.    Defendants are persons who, under color of law and in the scope of their employment

18

have subjected plaintiffs to the deprivation of their civil rights as guaranteed by the First, Fourth,

19

Fifth and Fourteenth Amendments of the United States Constitution. Said rights include plaintiffs'

20

right to free speech, freedom from arrest without probable cause, and substantive and procedural due

21

process guaranteed by the First, Fourth, Fifth and Fourteenth Amendments.

22

105.    At all times herein mentioned, DA HALLINAN acted or purported to act within the

23

course and scope of his employment and under color of law. Furthermore, DA HALLINAN, as the

24

elected District Attorney, was directly responsible for the supervision and management of the

25

District Attorney's Office for  the CITY  AND COUNTY OF SAN FRANCISCO and was the

26

employee, agent, servant, final policymaking authority,  final decision-maker, and managing agent,

27

or other representative of the CITY  AND COUNTY OF SAN FRANCISCO,  and of the BOARD

28

OF SUPERVISORS for CITY AND COUNTY OF SAN FRANCISCO, and in doing the things

1    alleged hereinafter, was acting within the course and scope of his employment, agency, final

2    policymaking authority, final decision-maker, or other representation, and with the permission and

3    consent of the BOARD OF SUPERVISORS for CITY AND COUNTY OF SAN FRANCISCO. In

4    addition, upon information and belief, defendants CITY AND COUNTY OF SAN FRANCISCO,

5    and the BOARD OF SUPERVISORS, approved and ratified the conduct of DA HALLINAN.

6         106.    DA HALLINAN wrongfully convened a Grand Jury to indict CHIEF SANDERS and

7    DEPUTY CHIEF ROBINSON, knowing that he did not have one scintilla of evidence of probable

8    cause of any crime committed by CHIEF SANDERS, DEPUTY CHIEF ROBINSON or by any

9    member of the Chief's command staff. On February 27, 2003, DA HALLINAN made an admission

10    to the Grand Jury that he had no evidence of conspiracy.

11         107.    In spite of his knowledge and admission that he had no evidence of a conspiracy, DA

12    HALLINAN maliciously, falsely, and unethically continued his mantra, **"WE HAVE RUN INTO**

13    **OBSTRUCTION AFTER OBSTRUCTION,"** in his successful efforts to incite, instigate and

14    inflame the Grand Jury to return a groundless indictment against CHIEF SANDERS, DEPUTY

15    CHIEF ROBINSON and SFPD command staff.

16         108.    Furthermore, DA HALLINAN wrongfully instituted the Grand Jury proceedings and

17    investigation against the plaintiffs herein, and made his false and unprivileged statements to the

18    media in retaliation for CHIEF SANDERS exercising his First Amendment Rights by objecting to,

19    and criticizing DA HALLINAN's improper proposal that CHIEF SANDERS interfere with the

20    ongoing police investigation and prevail upon some of the officers to plea to misdemeanors, in

21    exchange for those officers to receive "a slap on the wrist." Said objections and criticisms by

22    Sanders were remarks of public concern, made in direct connection with his public employment and

23    were Constitutionally protected.

24         109.    DA HALLINAN, by instituting the wrongful grand jury proceedings without probable

25    cause and by his other wrongful conduct alleged herein, caused CHIEF SANDERS and DEPUTY

26    CHIEF ROBINSON to be suspended from their public service as leaders of the SFPD while the

27    criminal charges were pending, and thus wrongfully deprived them of their public employment.

28         110.    DA HALLINAN interfered by threats, intimidation and coercion, and attempted to

1    interfere by threats, intimidation and coercion, with the exercise and enjoyment by CHIEF

2    SANDERS and DEPUTY CHIEF ROBINSON of rights secured by the Constitution and laws of the

3    United States and of the rights secured by the Constitution and laws of this State of California.

4          111.    Further, DA HALLINAN, agent of The CITY AND COUNTY OF SAN

5    FRANCISCO and final decision and policy maker, and acting on behalf of  The CITY AND

6    COUNTY OF SAN FRANCISCO engaged in a pattern and practice of conduct as a law enforcement

7    officer that deprived plaintiffs  CHIEF SANDERS and DEPUTY CHIEF ROBINSON of rights,

8    privileges and immunities secured and protected by the Constitution and laws of the United States

9    and by the Constitution and laws of the State of California.

10         112.    Said conduct was the legal and proximate cause of damages to plaintiffs as alleged

11   herein below under "DAMAGES." DA HALLINAN's conduct was willful, wanton, malicious,

12   fraudulent and in conscious disregard for the rights of plaintiffs.

13         **WHEREFORE,** Plaintiffs request relief as hereinafter provided.

14

15                              **ELEVENTH CAUSE OF ACTION**
                      **(Violation of California Labor Code Section 1102 and 1102.5)**
16         **CHIEF SANDERS and DEPUTY CHIEF ROBINSON Against All Defendants**

17         113.    Paragraphs 1 through 112 are incorporated herein by reference.

18         114.    Following CHIEF SANDERS' refusal to corrupt the criminal justice system as DA

19   HALLINAN  had proposed, DA HALLINAN retaliated by orchestrating a massive media campaign

20   defaming the integrity of the Police Department, directing his media campaign entirely at the Chief,

21   the department and its command staff.  DA HALLINAN also retaliated against Plaintiffs CHIEF

22   SANDERS and DEPUTY CHIEF ROBINSON because CHIEF  SANDERS refused to support him

23   in his bid for reelection to the position of District Attorney for the CITY AND COUNTY OF SAN

24   FRANCISCO. Da HALLINAN's wrongful conduct and actions were efforts to coerce, influence and

25   attempt to coerce and  influence  CHIEF SANDERS to adopt and refrain from adopting a particular

26   course or  political line,  action and activity.

27         115.    Plaintiffs have been injured by being deprived of their rights and privileges as

28   citizens of the United States, and have been damaged as a result thereof.

           116.    Said conduct was the legal and proximate cause of plaintiff's damages as alleged

1  herein under "DAMAGES."

2      **WHEREFORE**, Plaintiffs request relief as hereinafter provided.

3                          **TWELFTH CAUSE OF ACTION**
                              **(Loss of Consortium)**
4      **Espanola Sanders and Ramona L. McCune-Robinson Against All Defendants**

5      117.    Paragraphs 1 through 116 are incorporated herein by reference.

6      118.    Defendants, by their actions, have caused plaintiff, ESPANOLA SANDERS to suffer

7  loss of consortium or to be reasonably certain to suffer in the future any of the following losses: loss

8  of her husband's love, companionship, comfort, affection, society, solace or moral support, loss of

9  enjoyment of sexual relations and loss of her husband's physical assistance in the operation and

10  maintenance of the home.

11      119.    Defendants,  by  their  actions,   have  caused  plaintiff,  RAMONA  L.

12  MCCUNE-ROBINSON to suffer loss of consortium or to be reasonably certain to suffer in the future

13  any of the following losses: loss of her husband's love, companionship, comfort, affection, society,

14  solace or moral support, loss of enjoyment of sexual relations and loss of her husband's physical

15  assistance in the operation and maintenance of the home.

16      120.    Said conduct was the legal and proximate cause of plaintiffs' damages as alleged

17  herein under "DAMAGES."

18      **WHEREFORE**, Plaintiffs request relief as hereinafter provided.

19                                  **DAMAGES**

20      121.    As result of said conduct, Plaintiffs CHIEF SANDERS and DEPUTY CHIEF

21  ROBINSON were denied their constitutional rights, maliciously and wrongfully prosecuted, suffered

22  the loss of their employment as leaders of the SFPD, and were irreparably damaged in their

23  reputations and careers.  Plaintiffs CHIEF SANDERS and DEPUTY CHIEF ROBINSON were

24  further injured economically by being forced to hire attorneys to defend against the baseless criminal

25  charges.  As a result, all plaintiffs suffered and continue to suffer mental and emotional distress,

26  humiliation, embarrassment, anxiety and pain. DA HALLINAN'S misconduct justifies an award of

27  punitive damages against DA HALLINAN.

28      **WHEREFORE**, Plaintiffs request relief as hereinafter provided.

## PRAYER FOR RELIEF

**WHEREFORE,** plaintiffs pray judgment be entered against all defendants and each of them jointly and severally:

1. For economic and non-economic damages in an amount according to proof.

2. For punitive damages against DA HALLINAN in an amount according to proof.

3. For an award costs, expenses and reasonable attorney's fees pursuant to 42 U.S.C. §1988.

4. To Grant such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury for all issues so triable.

/ /

/ /

**Amended Complaint for Damages**

29

DATED:   October 20, 2004

**LAW OFFICES OF CHARLES A. BONNER**

By:_____
CHARLES A. BONNER, Esq.
Attorney for Plaintiffs
Chief Prentice Earl Sanders,
Espanola Sanders,
David R. L. Robinson and
Ramona L.  McCune-Robinson

30

**Amended Complaint for Damages**

# EXHIBIT 1

**FILED**

San Francisco County Superior Court

FEB 2 7 2003

GORDON PARK-LI, Clerk

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

_Deputy Clerk_

IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

**188728-9**

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, ) | NO. |
| ) | |
| Plaintiff, ) | INDICTMENT FOR FELONIES, |
| ) | AND MISDEMEANORS, TO WIT: |
| vs. ) | |
| ) | 243(d) PC/Fel. |
| ALEX FAGAN, JR.; DAVID LEE; ) | 245(a)(1) PC/Fel. |
| MATTHEW TONSING; ) | 242 PC/Misd. |
| _David Robinson_ ) | 182(a)(5) PC/Fel. |
| _Greg Suhr_ ) | |
| _Earl Sanders_ ) | |
| _Alex Fagan_ ) | |
| _John Syme_ ) | |
| _Ed Cota_ ) | |
| _Greg Corrales_ ) | |
| ) | |
| Defendants. ) | |

ALEX FAGAN, JR.; DAVID LEE and MATTHEW TONSING, defendants, are
accused by the Grand Jury of the City and County of San
Francisco, State of California, by this Indictment, of the crime
of felony, to wit: VIOLATION OF SECTION 243(d) OF THE CALIFORNIA
PENAL CODE, committed as follows:  The said defendants, ALEX
FAGAN, JR.; DAVID LEE and MATTHEW TONSING, on or about the 20th
day of November, 2002, at the City and County of San Francisco,
State of California, did willfully and unlawfully use force and
violence upon the person of JADE SANTORO, resulting in the
infliction of serious bodily injury on such person.

COUNT II:

ALEX FAGAN, JR.; DAVID LEE and MATTHEW TONSING, defendants, are further accused by the Grand Jury of the City and County of San Francisco, State of California, by this Indictment, of the crime of felony, to wit: VIOLATION OF SECTION 245(a)(1) OF THE CALIFORNIA PENAL CODE, committed as follows:  The said defendants, ALEX FAGAN, JR.; DAVID LEE and MATTHEW TONSING, on or about the 20th day of November, 2002, at the City and County of San Francisco, State of California, did willfully and unlawfully commit an assault on JADE SANTORO by means of force likely to produce great bodily injury.

COUNT III:

ALEX FAGAN, JR. and DAVID LEE, defendants, are further accused by the Grand Jury of the City and County of San Francisco, State of California, by this Indictment, of the crime of felony, to wit: VIOLATION OF SECTION 245(a)(1) OF THE CALIFORNIA PENAL CODE, committed as follows:  The said defendants, ALEX FAGAN, JR. and DAVID LEE, on or about the 20th day of November, 2002, at the City and County of San Francisco, State of California, did willfully and unlawfully commit an assault on ADAM SNYDER by means of force likely to produce great bodily injury.

COUNT IV:

ALEX FAGAN, JR. and DAVID LEE, defendants, are further accused by the Grand Jury of the City and County of San Francisco, State of California, by this Indictment, of the crime of misdemeanor, to wit: VIOLATION OF SECTION 242 OF THE CALIFORNIA PENAL CODE, committed as follows:  The said defendants, ALEX FAGAN, JR. and DAVID LEE, on or about the 20th day of November, 2002, at the City and County of San Francisco, State of California, did willfully and unlawfully use force and violence upon the person of ADAM SNYDER.

COUNT V:

David Robinson, Greg Suhr, Earl Sanders, Alex Fagan, John Syme, ED Cota, Greg Corrales

defendants, are accused by the Grand Jury of the City and County of San Francisco, State of California, by this Indictment, of the crime of felony, to wit: VIOLATION OF SECTION 182(a)(5) OF THE CALIFORNIA PENAL CODE, committed as follows:  The said defendants, between the 20th day of November, 2002, through the 23rd day of February, 2003, both dates inclusive, at the City and County of San Francisco, State of California, did agree to conspire and did further agree to obstruct justice.  In the conduct and furtherance of said conspiracy, the said defendants committed the following overt acts:

OVERT ACT NO. 1:

Between the dates of November 20, 2002 and February 23, 2003, in the County of San Francisco, defendants  David Robinson

rejected and placed "on hold" a police lieutenant's request for police department "administrative messages."

OVERT ACT NO. 2:

Between the dates of November 20, 2002 and February 23, 2003, in the County of San Francisco, defendants  David Robinson, Greg Suhr

terminated a program of interviews of potential police officer witnesses and directed that information gathering be limited to written interrogatories and answers.

OVERT ACT NO. 3:

Between the dates of November 20, 2002 and February 23, 2003, in the County of San Francisco, defendants  David Robinson

rejected and placed "on hold" a supervising police lieutenant's request for listings of police department cellular phone assignments and phone numbers.

3

**OVERT ACT NO. 4:**

On or about _January 18, 2003_ , in the County of San Francisco, defendants _Earl Sanders, Alex Fagan, David Robinson_

reassigned the supervising police lieutenant out of the police detail designated to investigate a reported felonious assault involving three off-duty police officers.

Ov

**A True Bill**

VIRGINIA STAAB
**Foreperson of the Grand Jury**

TERENCE HALLINAN
**District Attorney**

ALBERT K. MURRAY
**Assistant District Attorney**

Names of witnesses examined before the Grand Jury on finding the foregoing Indictment:

| | |
|---|---|
| 1. Marsha Ashe | 22. Robert Glembot |
| 2. Carl Biscevic | 23. Stephen Gudelj |
| 3. Hugo Bustamonte | 24. Scott Burley |
| 4. Harold Butler | 25. Chris Lamotte |
| 5. Richard Cairns | 26. Dan Lawson |
| 6. Larry Camilleri | 27. Ron Liberta |
| 7. Steve Caniglia | 28. Ray Lock |
| 8. Doreen Carrol | 29. Dan Miller |
| 9. Paul Chignell | 30. Lynn O'Connor |
| 10. Kyle Ching | 31. Henry Parra |
| 11. Gene Cornyn | 32. Julie Renfro |
| 12. Greg Corrales | 33. Jim Reyes |
| 13. Ed Cota | 34. David Robinson |
| 14. Brian Delahunty | 35. Jade Santoro |
| 15. Joe Dutto | 36. Jerome Senkir |
| 16. Alex Fagan, Sr. | 37. Adam Snyder |
| 17. Paul Falconer | 38. Mike Stasko |
| 18. Jason Fazio | 39. Boyd Stephens |
| 19. Martin Ferreira | 40. John Syme |
| 20. John Fewer | 41. Steve Venters |
| 21. Susan Frazier | 42. Francis Woo |

4

<u>Overt act #5</u>

Between the dates of November 20, 2002 and February 25, 2003, in the City and County of San Francisco, defendant John Syme and Ed Cota failed to perform a cold show, moved the suspects together from the scene of the crime to the Northern Police Station and generally failed to conduct proper police duties and procedures in the course of an investigation.

<u>Overt act #6</u>

Between the dates of November 20, 2002 and February 25, 2003, in the city and county of San Francisco, defendants, Greg Corrales, John Syme and Ed Cota promoted misinformation about the characterization of the event occurring on November 20, 2002 as "mutual combat" and promoted misinformation about the sobriety status of the 3 defendants, Alex Fagan, Jr, Matt Tonsing and David Lee.

## CERTIFICATION OF COUNTY CLERK

STATE OF CALIFORNIA )
) ss.
City and County of San Francisco )

I, GORDON PARK-LI, Clerk of the Court of the City and County of
San Francisco, State of California, do hereby certify that the within
is an original indictment found by the Grand Jury of the City and
County of San Francisco, which was this day presented, in open court
by the foreman/foreperson of, and in the presence of, the said Grand
Jury, and that the said indictment was thereafter on this day filed
with me as a record of said court.

IN WITNESS WHEREOF, I have hereunto set my hand and the seal of
the said court.

DATED: 2/27/28                                GORDON PARK-LI, Clerk

By: _____
DEPUTY

### ORDER ASSIGNING CAUSE AND FIXING BAIL

It is hereby ordered that a bench warrant issue for the arrest
of each of the within named defendants and that bail as to each
defendant be fixed in the sum of:

| DEFENDANT | | CASH OR SURETY BOND | |
|---|---|---|---|
| ALEX FAGAN JR  91,500 | DAVID ROBINSON  15,000 | JOHN SYME  15,000 |
| DAVID LEE  91,500 | GREG SUHR  15,000 | Ed COTA  15,000 |
| MATTHEW TONSING  90,000 | EARL SANDERS  15,000 | GREG CORRALES  15,000 |
| | ALEX FAGAN  15,000 | |

In the event that bail be posted by PROPERTY BOND, the amount
thereof shall be twice the amount hereinbefore fixed.

It is further ordered that the within named indictment and cause
be assigned to Department No. 22 .

DATED: 2-27-02                         _____
PRESIDING JUDGE

# EXHIBIT 2

Department 22

Friday, April 4th, 2003

People v. Fagan, et al.

-----oOo-----


THE COURT:  Good afternoon, Ladies and Gentlemen.  Can we have appearances from counsel please.

THE CLERK:  Lines 114 through 121.

MR. HALLINAN:  Terrence Hallinan for the People.

MR. MERIN:  Good afternoon, Your Honor.  David Merin for the People.

MS. MARTIN:  Good afternoon.  Michon Martin for the People.

MR. COLEMAN:  And Jerry Coleman for the People.

THE COURT:  Good afternoon.

MR. HANLON:  Good afternoon, Your Honor.  Stuart Hanlon for Gregory Suhr who is in court and present.

MR. DAVIS:  Good afternoon, Your Honor.  Leland Davis appearing with Deputy Chief David Robinson who is present.

MR. FAGAN:  Jim Collins for Alex Fagan.  Good afternoon.

MS. HENLEY:  Edna Henley on behalf of Mark Nicco for David Lee who is not present.

MS. HORNE:  Freya Horne on behalf of Matthew Tonsing who is not present.

MR. WACHTEL:  Good afternoon, Your Honor.  Arthur Wachtel and Maitry Badami for Lieutenant Ed Cota who is present, Your Honor.

MR. FINNIGAN:  Good afternoon.  Bob Moore and Jim Finnigan for Lieutenant John Symes who is present, Your Honor.

MR. FAZIO:  Good afternoon, Your Honor.  Bill Fazio.  I'm

1   do.

2       In fact, according to the evidence Suhr and Robinson disagree as

3   to the kind of statements to be taken.  Again this conduct of

4   calling investigators may be inappropriate, may rise to conduct

5   which may be criminal, but there is no evidence of an agreement.

6   There is no conspiracy.

7       Deputy Chief Robinson.  There are again numerous and

8   questionable actions as taken by the deputy chief.  These actions or

9   inactions raise serious concerns.  However, again there is no

10  evidence of any agreement.

11      We have evidence of numerous meetings where (unintelligible) not

12  a defendant, Keyhoe, not a defendant, Hite, not a defendant, Ashe,

13  not a defendant, were present along with Suhr.  However, no

14  testimony, no evidence, was presented at any of those meetings that

15  at any of those meetings was there anything that could equate an

16  agreement as to the obstruction of justice.  Surely, if there was

17  that testimony would have been elicited from at least Ashe who

18  testified at the grand jury.  Again without an agreement there is no

19  conspiracy.

20      The Court certainly appreciates the grand jury's efforts in

21  handling a dilemma were they were faced with many, many,

22  irregularities.  Many, many, things, quite frankly, that seemed

23  inappropriate was done prior to their receiving the case.

24      The grand jury was presented with witnesses that were, quite

25  frankly, arrogant, self-righteous, and filled with attitude.  The

26  grand jury, according to the transcript, was given no direction on

27  the law of conspiracy -- not conspiracy.  Obstruction of justice.

28      Other than and the only law the grand jury was left to drift in

1  a sea of evidence of preferential treatment, hearsay, innuendo,

2  accusations, evidence of delay, evidence of interference, and other

3  inappropriate actions by individual members who are now defendants,

4  the grand jury was not given lesser or different offenses which

5  could have been charged such as individual acts or obstructions of

6  justice.

7      I want to emphasize to you in no way does this Court condone the

8  manner in which this matter was handled.  However, the law requires

9  that for conspiracy to exist, there must be an agreement.  Tacit or

10  otherwise.

11      On February 27th, 2003, both prosecutors told the grand jury

12  there was not enough evidence to indict on a conspiracy charge.  The

13  DA presented no other charges other than the conspiracy.  In the

14  People's opposition there is a massive statement of facts with a

15  detailed table of context listing everything from cover up to broken

16  links in chain of command from dawn of investigation.  Of the

17  investigations, some twenty-six entries in the table of contents,

18  not one lists an agreement or the agreement.

19      Although on February 27th the District Attorney found not enough

20  evidence for the conspiracy charge the papers in oppositions filed

21  with this court want this court to fill in the blanks to hypothesize

22  some fact that would make an agreement the problem is the facts that

23  this court had to review are exactly those same facts that the grand

24  jury had before it.

25      Given this situation, the Court is troubled by the District

26  Attorney's failure to abide by the ethics code to dismiss this case

27  when they themselves felt there was no evidence to support the

28  charges.  And since the District Attorney's Office will not do it,

1  the Court must.  Despite the numerous improper acts and events that

2  transpired there is simply no way to find an agreement that is

3  essential to a conspiracy.  Thank you, Ladies and Gentlemen.

4      The 995 motion is therefore granted.  The charges against

5  Sergeant Symes, Lieutenant Cota, Captain Corrales, Commander Suhr,

6  and Deputy Chief Robinson are dismissed.

7      MR. HALLINAN:  There are still motions.

8      THE COURT:  Yes.  Are we back in session?

9      THE CLERK:  Yes, Your Honor.  All right.  So, trial date is

10  vacated for those defendants?

11      MR. HALLINAN:  There was a motion by Mr. Hanlon on behalf of

12  Deputy Chief Suhr for certain discovery.  I would assume that your

13  ruling moots that motion?

14      THE COURT:  That's what I would assume.  He has no standing any

15  more.

16      MR. HANLON:  We have nothing to say.

17      THE COURT:  Finally.

18      MR. HANLON:  Finally.

19      MR. HALLINAN:  What's happening with the vacated trial date?

20  Did we vacate the trial date?

21      THE COURT:  We will deal with that right now.  Mr. Collins has

22  his own motion.

23      MR. HALLINAN:  And then there is also a motion by Mr. Collins to

24  find sanctions for a filing.

25      THE COURT:  I have read that and I am going to deny Mr. Collins'

26  motion without any argument.

27      MR. HALLINAN:  All right, Your Honor.

28      THE COURT:  Mr. Collins has another pending motion which I am

# EXHIBIT 3

# FILED

San Francisco County Superior Court

AUG 2 0 2003

GORDON PARK-LI, Clerk
BY: _____

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN FRANCISCO

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, <br><br> Plaintiff/Respondent, <br><br> v. <br><br> EARL SANDERS, et al., <br><br> Petitioner/Defendant. | MCN  2096592 <br> SCN  188728-06 <br><br><br> ORDER <br><br> Dept. 22 <br> Hon. Ksenia Tsenin |

## ORDER

On July 1, 2003, Prentice E. Sanders, the Chief of Police of the City and County of San Francisco, filed a motion with this Court to declare him factually innocent of the charges contained in Indictment No. 188728-06, filed by the Grand Jury on February 27, 2003. In addition, Petitioner Chief Sanders petitioned this Court for an order directing the sealing and destruction of all arrest, booking, fingerprinting, and other law enforcement records pursuant to Pen. Code § 851.8. Petitioner Chief Sanders submitted declarations under penalty of perjury, the entire police case file of the police investigation, and the Court has taken judicial notice of the proceedings before the Grand Jury and this Court relating to People v. Alex Fagan, Jr., et al., Indictment No. 188728-1.

Based on the record before this Court and there being no dispute by the parties, the Court finds and declares Petitioner Chief Earl Sanders is FACTUALLY INNOCENT of the charges contained in the Indictment filed February 27, 2003. Under subdivision (b) a finding of factual innocence and an order for the sealing and destruction of records pursuant to this section shall not be made unless the court finds that no reasonable cause exists to believe that the arrestee committed the offense for which the arrest was made.

ACCORDINGLY, IT IS HEREBY ORDERED THAT:

The law enforcement agency having jurisdiction over the offense, the Department of Justice, and any law enforcement agency which arrested Petitioner or participated in the arrest of Petitioner for the offense for which Petitioner has been found factually innocent under Pen. Code § 851.8 seal their records of the arrest and the court order to seal and destroy such records, for three years from the date of the arrest and thereafter destroy their records of the arrest and the court order to seal and destroy such records.

IT IS FURTHER ORDERED THAT:

The law enforcement agencies having jurisdiction ocer the offense and the Department of Justice request the sealing and destruction of any records of the arrest which they have given to any local, state, or federal agency, person or entity.

IT IS FURTHER ORDERED THAT:

The Court will retain jurisdiction over this Petition to insure full compliance by all law enforcement agencies.

Date: 8/20/03

Hon. Ksenia Tsenin
Judge of the Superior Court of San Francisco

THE ANNEXED INSTRUMENT IS A
CORRECT COPY OF THE ORIGINAL
ON FILE IN MY OFFICE.
ATTEST: CERTIFIED

OCT 1 7 2003

GORDON PARK-LI, Clerk
Superior Court of California, County of San Francisco
BY _____
DEPUTY CLERK

TERENCE HALLINAN
District Attorney
State Bar No. 39953
JERRY P. COLEMAN
Assistant District Attorney
State Bar No. 78744
MICHON MARTIN, SBN 197164
DAVID MERIN, SBN 193855
850 Bryant Street
San Francisco, CA 94103
Telephone: (415) 553-1579

Attorneys for the Plaintiff

FILED
SUPERIOR COURT
OF CALIFORNIA OF
SAN FRANCISCO

03 JUL 30  AM II: 57

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA,<br>Plaintiff, | ) | No.: 188728-06<br>MCN 2096592 |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | Hearing Date: August 6, 2003 |
| | ) | |
| EARL SANDERS,<br>Defendant/Petitioner. | ) | Time: 9:00 am |
| | ) | Department: 22 |

PEOPLE'S RESPONSE TO DEFENDANT/PETITIONER SANDERS' MOTION
FOR AN EVIDENTIARY HEARING PURSUANT TO PENAL CODE 851.8

DATED: July 30, 2003

Respectfully Submitted,

Jerry P. Coleman
Assistant District Attorney

1

1. Defendant Sanders is entitled to an evidentiary hearing if the prosecution does not concur

with the defense request for relief pursuant to Penal Code §851.8. Penal Code §851.8(a), (d);

*People v. Chagoyan* (2003) 107 Cal.App.4[th] 810.  The Court, at such a contested hearing, shall

deny the motion unless it finds "that no reasonable cause exists to believe that the arrestee

committed the offense for which the arrest was made." Penal Code §851.8(b).  The initial

burden is upon defendant to establish "that facts exist which would lead no person of ordinary

care and prudence to believe or conscientiously entertain any honest and strong suspicion that

the person arrested is guilty of the crimes charged." *Chagoyan*, 107 Cal.App.4[th], at 816.

However, as noted by our Supreme Court in *People v. Adair* (2003) 29 Cal.4[th] 895, 909: "In

sum, the record must exonerate, not merely raise a substantial question as to guilt."

2. At least twelve grand jurors of the 2002-C Indictment Grand Jury returned an Indictment

charging Defendant Sanders with conspiracy to obstruct justice (Penal Code §182.5).   The

prosecution was under legal obligation to file this Indictment with the Court. *Bradley v. Lacy*

(1997) 53 Cal.App.4[th] 883, 892-93: "The decision whether or not to indict, i.e., to initiate a

criminal prosecution, resides entirely with the grand jury.  Once the grand jury has voted an

indictment, the process admits of no opportunity for the district attorney to intercede, and calls

for the immediate presentment of the indictment directly to, and its filing with, the superior

court, thereby commencing a criminal prosecution. ... [T]he authority of the grand jury

independent of the district attorney to conduct investigations culminating in indictment cannot

be gainsaid."  Believing (as we do) these indicting grand jurors to be 'persons of ordinary care

and prudence who held honest and strong suspicions of the guilt of the accused', the

prosecution could refuse to concur to Defendant's instant petition and thus force a hearing.

2

TERENCE HALLINAN
DISTRICT ATTORNEY

3. However, in light of the People's March 11, 2003 motion in open court to strike Defendant Sanders from the indictment, after our careful, independent review of the 1352 page transcript of grand jury proceedings, the People, based on the totality of circumstances, concur with the petition's request for relief. (Should new evidence come to our attention, the granting of this motion would not interfere with the People's ability to file new charges, as any finding of factual innocence pursuant to Penal Code §851.8 is inadmissible in subsequent criminal actions. Penal Code §851.8(i).)

4. Therefore, any hearing under Penal Code §851.8 being mooted by our concurrence to the petition's request for relief, the People do not oppose the Court granting the statutory relief allowed, to wit: sealing and thereafter destruction of the records of Defendant Sanders' arrest by any local law enforcement agency and any state or federal agency given such records.

5. Finally, however, in light of the highly argumentative, inaccurate, and potentially inappropriate 1  pleadings filed by the defense seeking this (now-mooted) hearing, the People must set the record straight with the following corrections:

a.  District Attorney Hallinan, in his brief meetings with Defendant Sanders (during the initial police investigation) urged Defendant Sanders to have his officer-witnesses cooperate with the District Attorney's investigation; Mr. Hallinan never told Defendant Sanders he wanted to "interrogate" the suspect assault officers. (Any suggestion to the contrary is either a misunderstanding of what was said, or patently absurd, given that Mr. Hallinan was aware these suspect officers had invoked their rights to remain silent, and had been a vigorous protector of

---

1 The People have filed a separate sanctions motion in response to defense counsel's inclusion in public pleadings, without sealing, the assault victim's criminal record history ("rap sheet") in apparent derogation of Penal Code §11142. (See, defense Exhibit 1, at IR 0099.)

3

defendants' rights for years as a defense attorney.)

b. District Attorney Hallinan, being fully aware the suspect assault officers had defense counsel, made no attempt to plea bargain the case against them with Defendant Sanders.

c. District Attorney Hallinan's comments to Defendant Sanders expressed regret over the manner in which the police investigation was proceeding; specifically, if that investigation had been properly handled so as to treat the suspect assault officers in the same manner as any other alleged felony assaulters, then any District Attorney's Office investigation into the police investigation's inadequacies would be unnecessary.  Indeed, the decision to seek the subpoena and investigative powers of the grand jury was due in large part to the refusal of the police department to complete its investigation in the manner deemed necessary by the prosecution.

d. District Attorney Hallinan did not seek Defendant Sanders' indictment from the grand jury, and as is clear from the transcript of proceedings, the instigation of the indictment against Chief Sanders came from the grand jury, not the District Attorney's Office.  After filing the indictment which was required by law, and after completing his thorough review of the entire massive transcript, District Attorney Hallinan exercised his independent judgment to remove Defendant Sanders from the conspiracy count.  (See, *Bradley v. Lacy*, 53 Cal. App.4[th] at  895; Penal Code §§1385, 1386.)

6. Lastly, it is noted that although Defendant Sanders petitioned the state Attorney General to exercise his constitutional supervisory power over district attorneys and remove the San Francisco District Attorney's Office from this case based on the same allegations as he raises in the instant petition, the Attorney General chose not to act but rather to allow this entire

4

criminal investigation and prosecution to remain in the hands of the local prosecution authority, the Office of San Francisco District Attorney Terence Hallinan.

DATED:  July30, 2003

Respectfully submitted,

TERENCE HALLINAN
District Attorney

By: _____
Jerry P. Coleman
Assistant District Attorney

_____
Michon Martin
Assistant District Attorney

_____
David Merin
Assistant District Attorney

## DECLARATION OF SERVICE

COURT NOS. 188728-06

I, Jerry Coleman, state:

That I am a citizen of the United States, over eighteen years of age, an employee of the City and County of San Francisco, and not a party to the within action; that my business address is 850 Bryant St., San Francisco, California  94103.

That on July 30 , 2003, I served the attached
PEOPLE'S RESPONSE TO DEFENDANT/PETITIONER SANDERS'
MOTION FOR AN EVIDENTIARY HEARING PURSUANT TO PC §851.8,
by delivering through the U.S. mail a true copy thereof to the following parties at the following addresses, unless stated otherwise:

Philip Scott Ryan
944 Union Street
San Francisco, CA 94133

I declare under penalty of perjury that the foregoing is true and correct.
Executed July 30, 2003, at San Francisco, California.

Jerry Coleman

5